O'HARE v. CHICAGO & ALTON RAILROAD COMPANY, *Appellant.*

1.  **Railroad** : NEGLIGENCE : EVIDENCE.   The report of an agent of a railroad, whose custom it is to make the same after accidents, to the division superintendent is admissible in evidence against the company, in an action for personal injuries, where it tends to show the occurrence of the collision which caused the injury and that the engineer of one of the engines permitted it to be run by a non-employe of the company, who was incompetent and unable to manage it, thereby causing the collision.

2.  ———— : SECONDARY EVIDENCE, OBJECTIONS TO.   The objection that a letter-press copy of the report and not the original was offered in evidence should have been made when the evidence was offered.

3.  **Demurrer to Evidence.**   The trial court, in passing on a demurrer to the evidence, is required to make every inference of fact in favor of the party offering the evidence which can reasonably be done.

4.  **Negligence** : QUESTION FOR JURY.   Where the evidence on the question of negligence is conflicting it should be submitted to the jury.

*Appeal from Jackson Circuit Court.*—HON. F. M. BLACK, Judge.

AFFIRMED.

*Gates & Wallace* for appellant.

(1) A letter-press copy of a paper, being secondary evidence, is inadmissible in evidence. *Chapen v. Siger*, 4 McLean, 378; *Foot v. Bently*, 44 N. Y. 171; *Ritchie v. Kinney*, 46 Mo. 298; *Blondeau v. Sheridan*, 81 Mo. 545. (2) A master, if otherwise without fault, is not responsible to a servant for the negligence of a fellow-servant. *Proctor v. Railroad*, 64 Mo. 112; *McDermont v. Railroad*, 30 Mo. 115; *Rohbeck v. Railroad*, 43 Mo. 187; *McGowan v. Railroad*, 61 Mo. 528. (3) It is not the duty of a master to employ only those who have never occasioned an accident or made a mistake. He is only required to act as a man of reasonable care and prudence would under like circumstances. Wood on M. & S., secs. 419, 432, 433; Whart on Neg., sec. 238; *Lee v. Bridge Co.*, 62 Mo. 567; *Moss v. Railroad*, 49 Mo. 167; *Huffman v. Railroad*, 78 Mo. 50. (4) A master's knowledge of a single act of negligence of a servant is not sufficient to prove that the master had knowledge of the unfitness, negligence, or general incompetency of the servant. *Lee v. Bridge Co.*, 62 Mo. 568; *Troost v. Railroad*, 57 Ill. 155; *Baula v. Railroad*, 59 N. Y. 356. (5) It is the duty of a railroad company to receive and transfer the cars of any other company, in the ordinary course of business, and although not so safe as those it owns, yet if in good repair, and of a kind in general use, it is not liable by reason of its so receiving or transferring the same. R. S., sec. 819; *Railroad v. Smithson*, 45 Mich. 212; *Baldwin v. Railroad*, 50 Ia. 680; *Railroad v. Black*, 88 Ill. 112; *Railroad v. Flanigan*, 77 Ill. 365; *Railroad v. Gildersleeve*, 33 Mich. 134; *Crutchfield v. Railroad*, 78 N. C. 300; *Hulett v. Railroad*, 67 Mo. 239; *Smith v. Railroad*, 69 Mo. 32; *Cagney v. Railroad*, 69 Mo. 416. (6) A failure to give a notice or signal on reversing an engine is not *per se* negligence,

and especially so when the evidence shows that under the circumstances it is not customary to do so. *Railroad v. Haley's Adm'r*, 25 Kan. 35 ; *Wallace v. Railroad*, 74 Mo 577 ; *Speed v. Railroad*, 71 Mo. 303 ; *Bell v. Railroad*, 72 Mo. 50 ; *Powell v. Railroad*, 76 Mo. 80 ; *Holman v. Railroad*, 62 Mo. 562. (7) An instruction that tends to mislead the jury as to material facts in the case, should not be given. (8) An instruction that assumes a disputed and material fact in the case, is erroneous. Instruction number four given by the court of its own motion, contains the error of assuming that there were injuries which were "occasioned and brought about by the careless or negligent acts of said Langer." It assumes the disputed points that there were acts of Langer which were careless or negligent, and that these occasioned or brought about plaintiff's injuries. *Wilkinson v. Thompson*, 82 Mo. 317 ; *Conner v. Taylor*, 82 Mo. 341 ; *Donnel v. Bank*, 80 Mo. 165 ; *State v. Wheeler*, 79 Mo. 366 ; *Railroad v. Waldo*, 70 Mo. 629 ; *Peck v. Ritchey*, 66 Mo. 114 ; *Ins. Co. v. Seminary*, 52 Mo. 480 ; *Moffatt v. Conkling*, 35 Mo. 453 ; *Turner v. Loler*, 34 Mo. 461 ; *Thompson v. Botts*, 8 Mo. 710. (9) Where, upon a consideration of all the evidence, it is apparent that plaintiff should not recover, the court should so instruct the jury.

*Gage, Ladd & Small* for respondent.

(1) No objection was made to the report of Ketchum, that it was a copy. The objection made was a matter of substance, viz., that the report did not tend to prove Langer's unfitness or defendant's knowledge of it. (2) The court properly refused to instruct the jury that plaintiff could not recover because he and Langer were co-employes. The charge was the negligence of defendant in retaining Langer in his employment, knowing him to be unfit for his position,

and Langer's negligence in causing the injury. (3) Langer's permitting Ketchum to take his engine was no mere "mistake or act of forgetfulness, or omission to exercise the highest degree of caution and presence of mind;" it was, on the other hand, "intentional, and done wantonly, regardless of consequences," and showed him to be an improper and unfit person for his position of trust. (4) Railroads are not bound to receive whatever man-killers connecting lines may offer them.

NORTON, C. J.—Plaintiff recovered judgment for damages for personal injuries alleged to have been occasioned by the negligence of the defendant, from which judgment defendant has appealed.

The petition substantially sets forth as the cause of action, the following, viz. : That plaintiff was an employe of defendant as a yardman in Kansas City, and that, on the eighteenth of March, 1883, defendant was engaged in moving from its yard and depot in the western part of the city, a train containing an unusually large number of cars, and for that purpose was using an engine at the head of said train in pulling it, which engine was under the control of Jesse Langer as engineer, and also another engine at the rear end of said train pushing it ; that, on account of the length of the train, and the nature of the track and surrounding obstacles, those employed on the hindmost engine could not see those employed on the front engine or front part of the train and *vice versa ;* that said Langer, engineer in charge of said front engine, was incompetent, reckless, and negligent, and unfit for the position, of which defendant had knowledge ; that defendant negligently and carelessly had and used as the rear car of said train, one, the bumpers or deadwoods of which were so constructed as to greatly enhance the danger of injury to any person coupling or attempting to couple the same to any other car or engine. It is further averred that it was the duty

of plaintiff to attend said engine in the rear of said train, and do whatever coupling was then required; that, as said train was proceeding eastward, from said western depot and yards, the said engine became uncoupled, and that it became plaintiff's duty to couple the same to said car, the bumpers of which were constructed as aforesaid; that, while he was proceeding to couple the same in the usual and customary manner, with due care on his part, the said Langer carelessly and negligently, and without any signal or notice being given, reversed said engine at the front of said train and caused said cars to be thrown back suddenly and with great violence to the rear, so that plaintiff having no notice thereof could not withdraw from between said bumpers and rear engine, where he had his right arm for the purpose of making the coupling, and that, by means thereof and the dangerous construction of said car and bumpers, plaintiff's arm was caught between said bumpers and engine, inflicting an injury resulting in the loss of his right hand and a portion of his arm. The answer, after making certain admissions as to defendant being a corporation, etc., denies the averments of the petition on which plaintiff bases his cause of action, and avers substantially that plaintiff's injury was caused by his own negligence.

During the trial plaintiff offered W. E. Bridges as a witness, who testified that he was the agent of defendant and in charge of the freight offices both at Twelfth street and Grand avenue; that he kept a book containing a letter-press copy of reports of accidents to persons and property; that these reports were then sent to the division superintendent at Slater; that the custom was to make reports to him which he copied into a book, which he produced, and was asked to read in evidence from said book the letter-impression copies of certain reports of an accident. This was objected to on the

ground that said reports were incompetent and irrelevant, and on the ground that they did not show how the accident occurred, or have any tendency to show any incompetency in running or managing an engine on the part of Langer, and as not being any knowledge to the company. No objection was made to the evidence on the ground that the original report instead of a copy should be produced. The objection was properly overruled, inasmuch as the evidence offered tended to show that a collision had occurred between switch engine 47, and train number 94; that Langer was engineer of said switch engine, and trusted it to be run by a non-employe and incompetent engineer, who could not manage it, and hence the collision.

It is next insisted that the court erred in refusing to give an instruction asked by defendant in the nature of a demurrer to the evidence. In passing upon a demurrer to evidence the court is required to make every inference of fact in favor of the party offering the evidence which can reasonably be made. *Buesching v. Gas Light Co.*, 73 Mo. 219. No controversy in this case is made by the evidence as to the following facts, viz.: That the train in question was being moved by an engine at its front and in charge of Langer as engineer, and by an engine at the rear end of the train in charge of one Green as engineer; that the hindmost car in the train was a United States rolling-stock car; that while the train was in transit plaintiff discovered that said car was uncoupled, and undertook to couple it, and while doing so received the injury for which he sues.

The disputed questions are: Was this United States rolling-stock car extra hazardous to plaintiff whose duty it was to make couplings? Was the engineer Langer in charge of the front engine incompetent and reckless, and if so did defendant have knowledge of it? Did said Langer, negligently and without warning, reverse his engine, thereby causing said train to be suddenly and

violently thrown back while plaintiff was engaged in making the coupling, and causing him to be injured? Was the injury the result of plaintiff's own negligence? As to all these disputed questions it may be said generally that the evidence is conflicting, as the following summary of it will show:

Witness Mallory testified that the United States rolling-stock cars are considered among all railroad men as man-killers, owing to the danger when a man goes to make a coupling; that the drawheads are constructed in ordinary western cars so that it gives a man from about twelve to fourteen inches room for his hand, but when he goes in between these cars he has no room at all. He has got to get underneath or on top. The western cars do not have these side bumpers. All the western roads have a different kind of car as to coupling. Any car with side bumpers is dangerous. These cars with bumpers are used on some eastern roads. The Hannibal & St. Joseph road had a good many of this kind of cars in use.

There is evidence on the other side tending to show that all the roads have carried more or less of these United States rolling-stock cars and received them from other roads; that the Hannibal & St. Joe road had about three hundred of them leased. Plaintiff testified that the Chicago and Alton road had none of the United States rolling-stock cars and that said cars were more dangerous than others because of the construction of the bumpers and deadwoods. As to his knowledge of the car in question he testified as follows: "This is the first United States rolling-stock car I had seen for a good while. If I had seen any I don't recollect it, but not to the best of my opinion while I was switching there, until I got caught with this car."

The evidence as to the incompetency of Langer tended to show that he had been laid off by defendant for sixty days for having left his engine in charge of one Ketchum, who undertook to run it in his absence,

and in doing so collided with another train; that he sometimes handled cars roughly. Witness Prudens testified "that he had been working with Langer a year and a half; that he sometimes handled cars pretty roughly. I know he was laid off at one time for breaking a car or engine, that Langer has not the reputation of being a good engineer, not with the men that work with him, not with a good many of them."

Witness Lee testified: " I have known Langer about three years; he was liable to run into trains down there; he is a reckless man in some respects. I have worked with him days and nights. I was always afraid whenever Langer came to work at night, because he would handle cars so roughly and I told the yardmaster so. I know something about Langer having been laid off by the company. He went over to play pool and he did not come round and he was laid off for five days for not coming round. The next I know Langer had a collision down at Big Blue, and he was laid off for five days. He came back and went to work again, and then got into trouble again and was laid off for thirty days or two months." In answer to the question what had happened when he was laid off the last time, witness said: "He was playing pool or cards in a saloon. He is a reckless, risky man. Other people said he was reckless, ran too fast."

E. Logan testified: "I am at present yardmaster for the Missouri Pacific. At the time of the Ketchum accident, I had charge of engine 47. Mr. Ketchum was in the engine as I found out afterwards; this was about a year before March 18, 1883. I asked Mr. Vaughan what my sentence was, he said it 'was death.' They stopped Langer's and my pay and we had to quit; as to Langer's reputation, as to being careful or otherwise, the management and handling of trains, there was always more or less kicking in the yards. There is nobody a good engineer in the estimation of the

yardmen. As to Langer I think there was no better, and others think he was careless. As to running an engine, I would not be able to judge." Quite a number of witnesses on the part of defendant testified that Langer was a competent engineer.

As to the question whether the engine was reversed by Langer without warning, the evidence is also conflicting. On this point plaintiff testified as follows: "Just as I was making the coupling the head man reversed his engine and threw it over and shot them all back. I did not see him do it, but from the jar that was at the hind end I think the engine must have been reversed. A man can generally tell. He cannot tell if it is from reversing the engine or setting the brakes. When a train is stopped suddenly you cannot always tell what is the cause of it. He must have thrown the engine over from the jar there was around there. They generally whistle when they want brakes, when they are going too fast. It is not usual to slack a train by throwing the engine over, and giving her steam backwards. The ordinary way for men on the train if they are going around there too fast is to have the men set the brakes. The train was moving nine or ten miles an hour."

Another witness testified as follows: "I was on this train, twelve or fourteen cars from the head engine, on a car. I don't know as anything happened more than he slacked up there. I can't tell whether he threw his engine over or not. The cars started back. I could not see him handle his engine. I could not tell what sent the cars back unless he reversed his engine. It is not customary for a man to stop trains that way. I did not see any brakes set. I did not get any signal to set brakes. The only occasion of such motion of the train that I know of would be to reverse the engine; the train was running seven or eight miles an hour. In my experience in railroading, there is not anything that would produce that kind of a jar except the reversal of the engine."

Arthur Lee testified: "I was on the train at the time of the accident about four cars from the engine. When we got near Grand avenue, we were going in the neighborhood of ten miles an hour. I set brakes to hold them up for fear of a collision, because a train is liable to be down there any minute, and he threw the engine over as I began to set brakes. It almost threw me down. I had no more set the brake up than he threw it over again and then I let the brake off. I commenced to set the brakes because I thought it was my duty to do so. There was no signal given at the time the engine was thrown over. If a man is likely to have a collision he will give a short blow with his whistle. When he slacks up it is not customary to give a signal to the men. If he gets to going too fast he will toot the whistle a little, and we will set up the brakes."

The evidence on this point is also conflicting. Langer, the engineer, testified that he was running about five or six miles an hour; that he did not at any time reverse his engine; that he had no occasion to reverse it that morning; that it would not be safe to run at ten miles an hour, and said: "If I was in charge of the engine and running that way, I would call for brakes and reverse my engine at the same time or shortly afterwards. I never ran down there as fast as seven or eight miles an hour. It is not customary for the engineer on a switch engine to give a signal to set brakes. If I was running ten miles an hour and wanted to check up suddenly and reverse my engine, I would regard it proper to give a signal for the brakemen to set brakes, and I would do it."

It is claimed that the demurrer to the evidence ought to have been sustained, for the reason that it shows that plaintiff was injured by his own negligence in not having seen that the car in question was coupled before it was started in the train, and that having worked with Langer, and aware of his incompetency as an engineer

(if he was incompetent), took the risk of working with him on the train in question. As to this last point, it is fully answered by the evidence of plaintiff that he did not know that Langer was the engineer in charge of the front engine, and as to the coupling of said car, he testified as follows: "It was my duty to see that the engine was coupled to that car, and it was coupled onto the car when we left the yards. We stopped a while at Twelfth street and opened the train ten or twelve cars from the hind end of it to let a lot of teams pass by. I saw McGowan couple the engine to the train before it left the yards. He was standing on the rear end of the engine. I was not with him. I could not tell from where I was whether the pin was actually put in or not. It was supposed to be coupled; the coupling-pin was not broken when I went to couple the car on after it was loose, it was pulled up. The pin was an inch or an inch and a quarter, and eight or ten inches long. When I went to make the coupling the pin was laying on the drawhead. I never noticed exactly how it was laying, until I went to make the coupling. The link was in the deadwood of the engine. I do not know how the pin got upon the drawhead without somebody putting it there. If the coupling had been made I do not know of any possible way for the pin to get upon the drawhead unless the engine was cut off and it was laid up there; the engine was cut off when I went back to make the coupling. It must have been cut off or the pin pulled at Twelfth street; I was too far away to tell, but I know that the engine could not pull the cars without it was coupled on."

Under this evidence the question as to whether it showed contributory negligence was for the jury, and the physical fact stated that the car had been pulled from defendant's yards to Twelfth street would seem to be a demonstration of the fact that the engine had been

O'Hare v. Chicago & Alton Ry. Co.

coupled to the car when it left the yards, independent of the positive statement of plaintiff that it had been so coupled. From the above review of the evidence it will be seen that, on the points necessary to plaintiff's case, it is conflicting; but under the rule laid down in *Buesching v. Gas Light Co., supra,* this is not sufficient to justify a court in sustaining a demurrer to the evidence. In all such cases, it is for the jury to pass upon the conflicting evidence, and determine on which side it preponderates, and for this reason, we are of the opinion that the court properly refused to give the instruction asked in the nature of a demurrer to the evidence.

The only remaining question is as to the action of the court in giving and refusing instructions, and it may be said that an examination of them shows that the jury are told that before they can return a verdict for plaintiff they must find that he was not injured by his own negligence, that Langer was an incompetent engineer, of whose incompetency defendant had notice, and that Langer was guilty of an act of negligence in reversing his engine without warning, and throwing the cars suddenly and violently backward while plaintiff was coupling the car, and that this negligent act was the cause of plaintiff's injury. The instructions fairly and plainly put before the jury the issues in the case, and in respect to the action of the court in giving and refusing instructions we see no well-grounded cause of complaint.

The judgment is hereby affirmed with the concurrence of Black and Brace, JJ.; Sherwood, J., dissents; Ray, J., absent.

SHERWOOD, J., DISSENTING.—Action for injuries received by plaintiff while in the employ of defendant. The petition, after the usual formal averments, in substance declares that: On March 18, 1883, and for

some time previous, plaintiff was an employe of defendant as yardman in Kansas City, his business being to couple and uncouple the cars of defendant's trains in and about the yards of defendant and upon the tracks of defendant; that on that date, defendant was engaged in moving a long train of its cars, using therefor an engine to pull them and one to push them, and so long was the train that it was impossible for those employed with one of the locomotives to see the other locomotive, or the cars at the other end of the train ; that defendant had in charge of the front locomotive one Langer, who was incompetent, reckless in his management of a locomotive engine, and had been so long thus incompetent and reckless, that defendant knew of his unfitness, and in thus keeping him in his position as engineer, was guilty of gross negligence ; that it was the duty of defendant to have a sufficient number of trainmen and brakemen to convey its employes at either end notice of the movements and intended movements of its employes or engine at the other end of the train ; and this defendant negligently failed to do ; that defendant negligently and carelessly had and used as the rear car of that train, one, the bumpers or deadwoods of which were so carelessly constructed as greatly and needlessly to enhance the danger of injury to any person coupling or attempting to couple the same to any other car or engine, by reason of the bumpers of said car being of unusual size and length, etc. ; that, as such yardman and employe of defendant, it was plaintiff's duty to attend the engine in the rear of the train, and do whatever coupling or uncoupling might be necessary at that end of the train; that, as the train was proceeding from the western depot and yard to the eastward, the engine became uncoupled, and it was plaintiff's duty to couple the same to the car aforesaid, with bumpers as aforesaid ; that, while attempting

to make such coupling, Langer, the engineer, negligently, carelessly, and without giving any notice or warning, reversed his engine at the front of the train, thereby causing the cars to be thrown back so suddenly and with such violence to the rear, by means of which, and of the negligent and carelessly constructed bumpers aforesaid, plaintiff's right arm was caught and crushed between the bumpers and the rear engine and broken, and his hand and wrist so crushed as to necessitate the amputation of a portion of his arm, etc., and damages were asked in the sum of fifteen thousand dollars.

The answer, after the usual formalities, denies that the train contained an unusual number of cars; admits that Langer was engineer of its front engine, but denies that he was or had been incompetent and reckless in his management of engines, and that defendant knew of such incompetency or recklessness, and was guilty of negligence in keeping Langer in its employ. And avers, on the contrary, that he was a careful man, and a skilful and competent engineer; denies that it neglected to have a sufficient number of brakemen or employes on the train; denies that Langer reversed his engine; admits that plaintiff's arm was caught and crushed while making the coupling, but claims it was so caught by reason of plaintiff's own negligence and the careless manner in which he attempted to make the coupling; states that the rear car was one belonging to the Hannibal & St. Joseph Railway Company, and of the kind known as the United States rolling-stock cars; that it had been received by defendant from the Hannibal & St. Joseph Railway Company, and was attached to the rear end of the train to be transferred by defendant to such company; denies that defendant was guilty of negligence in using the car in its train; avers that plaintiff had been in its employ in and about its yards, etc., at Kansas City, for years prior to the accident, was well acquainted with

the different kinds of cars used on its road, and received by it from other railroad companies; and with the cars known as the United States rolling-stock cars, and with the construction of the bumpers and deadwoods of the rear car at the time he attempted to make the coupling; avers that Langer was a co-employe of plaintiff; that plaintiff, at the time he started out with the train, knew that Langer, with whose reputation as an engineer he was well acquainted long prior to the accident, was in charge of the train, and that plaintiff also at the time knew the number of brakemen and trainmen employed on the train in question. In conclusion, defendant avers that it was plaintiff's duty as yardman either to couple the rear engine to the train or to see that the same was done, before it left defendant's yards, but that plaintiff carelessly and negligently failed either to make the coupling or to see that the same was done, and but for his negligence in this respect, the accident complained of would not have occurred, etc. Plaintiff's reply was a general denial. A trial was had and resulted in a verdict in plaintiff's favor for eight thousand dollars.

I. The testimony in this cause shows that at the time of the accident the car being transferred to the Hannibal & St. Joseph Railroad, had been received from that road; that it was what is known as a United States rolling-stock car; and that it was apparently a new car and in good condition, and had those bumpers or drawheads that are claimed to be dangerous; that, with an interval of some three months, plaintiff had been employed in defendant's yards for four years; that he knew the car he was transferring was a Hannibal car and a United States rolling-stock car; and the testimony also shows that during the time plaintiff was an employe of the defendant, cars like the one in question were being constantly received from the Hannibal & St. Joe, and from other railroads.

Our statute provides that railroads in this state

O'Hare v. Chicago & Alton Ry. Co.

"shall receive and transport each other's passengers, tonnage, and cars, loaded or empty, without delay or discrimination." R. S. 1879, sec. 819. This statute was enacted in conformity with the provisions of section thirteen, article twelve, of the constitution, and so far as quoted above, is a literal transcript of that section. Under these constitutional and statutory mandates there is no choice left the railroad companies as to receiving and transporting cars, etc., of other roads, and the right one railroad company has under these constitutional and statutory provisions to compel the transportation of its cars, etc., necessarily carries with it the coincident right to have such cars returned to their owner. It being the duty of the defendant to receive the car in question, the performance of that duty cannot be imputed to it as negligence towards the plaintiff, by reason of the fact that the drawheads on that car were not so safe as those used upon other cars. In other words, the performance of a duty commanded by the law, cannot be made the basis of an action for negligence resulting simply from such performance. And in the case at bar the plaintiff when testifying said: "There would be no risk making the coupling if there was any other kind of car," thus laying the blame on the *kind* of car employed.

Besides, the plaintiff having been so long in the employ of the defendant, the very business of the road was of itself notice to him of the risks he would have to run and of the perils he would have to incur in order to assist in the conduct of such business. That business notified him that, in the discharge of his duties, he would have to couple and uncouple cars from other roads; cars differing in their construction; cars with various deadwoods, some more dangerous to handle than others. Thus notified, and in the most practical way, of the dangers incident to his position, the law presumes that he accepted that position along with its

accompanying and ordinary risks, and as part and parcel thereof. In this court, the doctrine is a familiar one, that an employe voluntarily assumes such risks as are incident to the business in which he is engaged, and that his employer does not incur liability to him because of not using the very best or the very safest appliances which the employe is to use in the ordinary routine of his duties. *Hulett v. Railroad*, 67 Mo. 239; *Smith v. Railroad*, 69 Mo. 32; *Cagney v. Railroad*, 69 Mo. 416. And elsewhere it is well settled that such a presumption as that before mentioned will prevail in cases like the one under consideration. *Railroad v. Flanigan*, 77 Ill. 365; *Railroad v. Black*, 88 Ill. 112; *Baldwin v. Railroad*, 50 Ia. 680.

The controlling question, however, in this case is the one adverted to in the beginning of this paragraph, *i. e.*, the duty imposed by the law upon the defendant to receive and transport cars, etc., from other roads. If such reception and transportation were not compulsory, the result, either from self interest or by law, would be the practical destruction of the commerce of the country. It would never do to stop the cars at the respective *termini* of the different roads, and there break bulk and transfer the freight to the cars of the connecting line; and it was no doubt to facilitate the commercial interests of the country, and to place them upon an unchangeable footing, that gave origin to the constitutional and statutory provisions before noted. Whatever were the reasons which induced those provisions, it is sufficient to say that so the law is written.

In other states having statutes similar to our own, it has been ruled that compliance with those statutes constitutes no negligence on the part of railroad companies. *Railroad v. Smithson*, 45 Mich. 212; *Baldwin v. Railroad*, 50 Ia. 680. For these reasons I am of opinion that the sixth instruction asked by defendant

stated the correct principle, and that the third instruction given by the court of its own motion should not have been given, since, as already seen from the authorities cited, it was based on an element not in the case, to-wit, that of negligence in receiving from, or transferring to, another road a United States rolling-stock car, which under the law of this state defendant was bound thus to receive and to transfer—irrespective of the question whether the drawheads on such car were more dangerous than those in ordinary use or not.

II. As already seen in the petition, there were three grounds of negligence upon which the plaintiff relied for recovery : (1) Using a defective and dangerous car ; (2) failing to furnish a sufficient number of men with the train, and (3) retaining Langer, the engineer, in its employ, knowing him to be incompetent, reckless, and unfit for his position, and that, through his carelessness and recklessness in reversing his engine at the time of the accident, that the injury complained of was inflicted on plaintiff. The first ground has been disposed of ; the second was abandoned at the trial, and the third remains to be considered. Negligence, unaccompanied by injury, furnishes no ground of action, so that, admitting that defendant was negligent in retaining in its employ Langer, still unless he reversed his engine, thereby causing the accident, the defendant cannot be held liable.

Now, what is the testimony on this point ? The plaintiff when testifying states that : " Just as I was in the act of making the coupling, the head man reversed his engine, and threw it over, and shot them all back. I did not see him do it, but from the jar there was at the hind end, I think the engine must have been reversed. A man can generally tell. *He cannot tell if it is from reversing the engine or setting the brakes.* When a train is stopped suddenly, you cannot always tell what is the cause of it."

Prudens, who was on the train at the time acting as brakeman, and twelve or fourteen cars from the head engine, testifies : "I don't know as anything happened more than he (meaning Langer) slacked up there. I can't tell whether he threw his engine over or not. The cars started back. I could not see him handle his engine. I could not tell what sent the cars back, unless he reversed his engine. The only occasion of such a motion of the train that I know of would be to reverse the engine. * * * They generally shut off steam at Main street; quit working steam; I never saw them without doing so, hardly ever. * * * I could not see what Mr. Langer done; I could not tell whether he reversed his engine or not; I can't swear to it; I don't know whether he reversed his engine or not. Shutting off steam would slacken the train. It would make no jar. In my experience in railroading there ain't anything that would produce that kind of a jar except reversal of the engine. * * * I was about twenty-five cars from the rear engine, and I could not tell whether the rear engine struck the rear end of the train or not."

Lee, the other brakeman, testifies: "I was on the train at the time of the accident, about four cars from the engine. When we got near Grand avenue, we were going in the neighborhood of ten miles an hour. I set brakes to hold them up for fear of a collision, and he threw the engine over as I began to set the brakes. It almost threw me down. I had no more set the brake up than he threw it over again, and then I let the brake off. * * * I set one brake and was setting another, when the accident happened. I was about four cars from the engine. I did not see him (Langer); I don't know that he threw the engine over, but I can tell easily enough."

Green, who was the engineer on the rear or pushing engine when the accident occurred, testified: That plaintiff "gave me a signal to stop when we got to the

bridge junction. * * * I did not notice anything particularly wrong with the train when he got hurt. I was watching the train. When he (plaintiff) gave me the signal to go ahead I had to go very cautiously in order to hitch onto the car. If he (Langer) had reversed his engine I should have been likely to have known it.''

Rankin, who was fireman with Green, testified, concerning the accident: "I do not know that the train slacked up at that time." O'Brien, who was on the engine with Green, testified: "I saw O'Hare give the signal for the engine to come ahead. * * * I did not see the train slack up any."

. Fellman, who was Langer's fireman, and with him on the train, testified: "I do not recollect whether the engine was reversed at the time of the accident to O'Hare or not." O'Neill, who was nearest to Langer, either on top of the train or on the engine, testified: "I don't think he reversed his engine on that train. * * * If the engine had been reversed, I think I would most likely know it. * * * He shut his engine off; this would cause the slack of the train to run towards the engine." Langer, the engineer on the head engine, testified: "I did not reverse my engine at any time. I had no occasion to reverse the engine at all, that morning."

Taking the testimony as already detailed, taking Langer's positive denial that he reversed his engine, and considering the fact that no one testifies to having seen him do so, though two men with him had ample opportunity of seeing him reverse his engine if that had been done, and considering the admission of plaintiff that the setting of brakes would cause a jar like that produced by reversing an engine, and that the brakes were set by Lee, it seems to me that the evidence was

too slight and inconclusive to go to the jury as establish-ing the fact that the engine was reversed. And the rule is well settled in this state that a mere *scintilla* of evidence will not answer as a basis on which to rest a verdict. *Powell v. Railroad*, 76 Mo. 80, and cas. cit.; *Morgan v. Durfee*, 69 Mo. 469, and cas. cit.

III. But waiving this point, it does not appear that Langer, even if he reversed his engine, was aware that the rear engine had become uncoupled from the train, or that plaintiff was attempting to couple it on. And the testimony is uncontradicted that it is not customary for the engineer of a switch engine to give any signal when about to reverse his engine, unless there is likely to be a collision with some train ahead.

In Kansas it has been decided in a well-considered case, a case held long under advisement, where neither statute, nor rules of the company, nor custom on the trains, require any signal or waving to the laborers on the train to enable them to hold fast or otherwise secure themselves to the cars, before reversing the engine, that if, in such circumstances, the engine is reversed and a laborer is killed in consequence of the concussion produced by reversing the engine, that it is not culpable negligence in the engineer to fail to give a signal before reversing his engine, and that the risks which an employe assumes, on entering upon his duties as such, include within them the one already referred to, Horton, C. J., remarking: "The engineer did not know that the deceased was on or near the rear end of the flat car when he reversed his engine; the cabooses intervened between him and the flats, and he was unable to see the flats at all.  *  *  *  He was not bound to anticipate some accident not likely to occur, or to so conduct his management of the engine as to prevent an accident not likely to happen.  *  *  *  There are some risks and perils that are incident to the peculiar hazards of

railroading, which every employe necessarily takes upon himself when he enters upon any service connected with the operation of a railroad, which even the extraordinary diligence of his co-employes may not always avert. The employe is presumed to have full knowledge of these usual and ordinary dangers to his employment, and greater care and caution are required of him to prevent accidents than of persons not so employed; and the engineer had the right to presume that all the other employes would act with proper care and caution in the discharge of their employment." *Railroad v. Haley*, 25 Kas. 35.

Taking this case just cited as announcing the correct rule, it must be held that even if there is sufficient testimony to show that Langer reversed his engine, yet it was not culpable negligence in him to do so in the circumstances already set forth. This view of the matter condemns the second instruction given by the court of its own motion, which holds it negligence in the engineer to reverse his engine without giving notice. For these reasons I think that an instruction in the nature of a demurrer to the evidence should have been given, admitting that there was evidence to go to the jury that Langer was careless or reckless as an engineer, and retained by the defendant after knowledge of such fact, because in this instance it does not appear that carelessness or recklessness on his part caused the injury.

IV. I will now endeavor to ascertain whether such an instruction should not have been given, also, for a further reason: Plaintiff was foreman of the gang of brakemen; he had charge of the engine that morning; he was the only one who had charge of the men at that time; it was his duty to see that the rear car was coupled on to the rear engine when it left the Twelfth street yards; this he did not attend to; for when he attempted to make the coupling, he found the pin lying on the

drawhead, where he says it could not have been had the coupling been properly made. It was his duty to give signals for setting brakes if the train was running too fast, and if he had given such a signal when about to couple the engine on to the rear car, it would have been obeyed ; but he gave no signal. He says the train was running nine or ten miles an hour, and at the time he saw the rear engine was uncoupled, he was about fifteen cars from the rear engine ; when he saw it was cut off, without giving any signal, he walked back, stepped down off the rear car, and signaled the rear engine to come up and to stop, and when it came up, he got on the footboard, and gave the signal to couple it on, and then the accident occurred. When he attempted to make the coupling, he says he was *not thinking about the deadwood at the time*, because his company was not in the habit of using them. He knew that the car belonged to the Hannibal road, and he knew it was being taken back to that road, and he knew that the drawheads were not alike upon all their cars, yet he went to make the coupling *without looking to see what kind of car it was*. It seems quite apparent from this evidence that it was plaintiff's own negligence, not to say absolute and reckless disregard of his own safety, which directly contributed to the accident, and that but for his negligence his injury would not have occurred. These facts, therefore, furnish an additional reason why an instruction as aforesaid should have been given.

V. Langer had been working for the defendant as engineer in Kansas City, ever since May, 1879. In the same month plaintiff also commenced working for defendant, and excepting three months, had worked four years for it. Plaintiff testifying, states : " Jesse Langer had been working for the Chicago & Alton since I had, I guess longer. He had been running switch engines in the different yards ; the man was laid off once

or twice. I was working with him then. I knew he was working in the yards at the time. I knew he was working for the company, but I did not know that he was working that engine that morning; was not supposed to know it." He said further: "I do not know who was on the front engine at the time the accident happened, because they generally change around there at certain times." The authorities with great uniformity announce the doctrine that one employe, having knowledge of the unfitness of another employe, of the same company, or one whose position or duties are such that he ought to be acquainted with such unfitness, when it had become well known, and does not give information to the company of such unfitness thus known to him, takes upon himself all the risks of injury from such unfitness, while engaged in the ordinary performance of his duties, as much so as if he had expressly contracted in reference to possible injuries from that cause. And where the employe has equal opportunity with his employer of ascertaining the unfitness of another employe, and the servant continues in the service, the true rule of decision is, that each party takes the risk.

In this case, the opportunities plaintiff had of becoming thoroughly acquainted with Langer's standing, habits, and character as an engineer, were, from their intimate association in the same yards for years, much better, it would seem, than those possessed by the common employer, and general reputation is recognized as one means of knowledge in this regard. In support of the above position, see the following: *Davis v. Railroad*, 20 Mich. 105, and cas. cit. ; Wood on M. & S., secs. 422, 423, 433 ; 2 Rorer on Railroads, 834; *Frazer v. Railroad*, 38 Pa. St. 104 ; *Laning v. Railroad*, 49 N. Y. 521 ; *Wright v. Railroad*, 25 N. Y. 562 ; *Haskins v. Railroad*, 65 Barb. 129. Upon this ground, also, a recovery should be denied the plaintiff ; and it makes

no sort of difference in his favor that he was not aware that Langer was the engineer on the head engine that morning, since his testimony shows that engineers were constantly changing places, in the yards; and it was one of the risks of his employment that he should be placed on the same train with Langer.

For the foregoing reasons, I am of the opinion that the judgment should be reversed, and, therefore, dissent from the conclusion reached by the majority of the court.