Thomas v. The Missouri Pacific Railway Comany, *Appellant.*

IN BANC.

1. **Railroad**: COUPLINGS OF FOREIGN CARS: EMPLOYE'S ASSUMPTION OF RISKS. A switchman whose duty it is to attend to the switches and couple cars at a railway station assumes the risk of coupling all cars which come to him in good order and sound condition, including those of other companies, no matter how peculiar or hazardous their couplings are.

2. ——: ——: ——: CONSTITUTION. The fact, that a switchman while making a coupling of his company's car to a foreign car is injured by reason of the difference between the couplings of the two cars, is not sufficient to impute negligence to the company, the foreign car being in good order and sound condition, since railroad companies are required by the constitution (art. 12, sec. 13) to receive the cars of other companies.

*Appeal from Vernon Circuit Court.*—Hon. W. J. Stone, Special Judge.

REVERSED.

*R. T. Railey* for appellant.

(1) The Wabash freight car and Central Pacific fruit car, mentioned in evidence, were both properly inspected at Nevada, immediately before they were attempted to be coupled by deceased, and ascertained to be sound and in good condition. Under the constitution and statute law of our state, defendant was compelled to receive and transport said fruit car without delay. Const. 1875, art. 12, sec. 13; R. S. 1879, sec. 819; R. S. 1889, sec. 2626. The supreme court of Michigan, in *Railroad v. Smithson*, 45 Mich. 222, in construing a

statute similar to our own, held, in a parallel case, that plaintiff was not entitled to recover. *Hathaway v. Railroad*, 51 Mich. 256. (2) The injury, therefore, complained of was one of the risks assumed by deceased; and the court, at the close of all the evidence in the case, should have sustained defendant's demurrer to the evidence. *Railroad v. Barrager*, 14 S. W. Rep. (Tex.) 242; *Harris v. Railroad*, 40 Mo. App. 256; *Tuttle v. Railroad*, 122 U. S. 189; *Porter v. Railroad*, 71 Mo. 77; *Hulett v. Railroad*, 67 Mo. 239; *Price v. Railroad*, 77 Mo. 509; *Gleeson v. Mfg. Co.*, 94 Mo. 206; *Railroad v. Gildersleeve*, 33 Mich. 134; *Hathaway v. Railroad*, 51 Mich. 254; *Railroad v. Smithson*, 45 Mich. 214; *Brewer v. Railroad*, 56 Mich. 621; *Lovejoy v. Railroad*, 125 Mass. 79; *Baldwin v. Railroad*, 50 Iowa, 685. (3) With full knowledge of all the facts, deceased attempted to make said coupling with the link in the drawhead of the freight car aforesaid, and, so far as the record shows in this case, without having made the slightest effort to protect himself from the ordinary risks of his employment. He was, therefore, clearly guilty of contributory negligence, and the court should have sustained defendant's demurrer to the evidence at the close of the whole case. *Smotherman v. Railroad*, 29 Mo. App. 266; *Tuley v. Railroad*, 41 Mo. App. 437; *Moody v. Railroad*, 68 Mo. 471; *Henze v. Railroad*, 71 Mo. 636; *Purl v. Railroad*, 72 Mo. 171; *Turner v. Railroad*, 74 Mo. 605; *Powell v. Railroad*, 76 Mo. 80; *Lenix v. Railroad*, 76 Mo. 91; *Hixson v. Railroad*, 80 Mo. 337; *Kelly v. Railroad*, 88 Mo. 534; *Harris v. Railroad*, 89 Mo. 236; *Yancy v. Railroad*, 93 Mo. 433; *Butts v. Railroad*, 98 Mo. 278; *Hudson v. Railroad*, 14 S. W. Rep. 15; Bishop on Non-Contractual Law, sec. 484; *Harris v. Railroad*, 40 Mo. App. 261.

*H. H. Blanton* for respondent.

(1) The court properly overruled defendant's objection to the introduction of any evidence in the case. *Hall v. Railroad,* 74 Mo. 300; *Barry v. Railroad,* 98 Mo. 76; *Keegan v. Kavanaugh,* 62 Mo. 230; *Crane v. Railroad,* 87 Mo. 588; *Brothers v. Carter,* 52 Mo. 372; *Clowers v. Railroad,* 21 Mo. App. 213; *Dedrich v. Railroad,* 21 Mo. App. 433; *Dutzi v. Geisel,* 23 Mo. App. 676. (2) Defendant is not compelled to receive cars with unsafe or dangerous machinery or appliances. It is true that under the law defendant was compelled to receive and transport the Wabash freight car and the Central Pacific fruit car. But defendant was bound, under the law, to transport the Central Pacific fruit car, equipped as it was, with this unsafe and dangerous coupler, in a manner that would be reasonably safe for its servants and employes, and that would have been in connection with passenger cars or cars equipped with like couplers. See authorities cited under proposition 1. (3) Deceased assumed all ordinary risks incident to his employment. But the risk to which he was subjected when attempting to make the coupling complained of was an extraordinary one, and was not assumed by him. *Johnson v. Railroad,* 96 Mo. 341; *Dale v. Railroad,* 63 Mo. 445; *Stockman v. Railroad,* 15 Mo. App. 583; *Gibson v. Railroad,* 46 Mo. 163; Wood's Law of Master & Servant [2 Ed.] secs. 357, 358, 359, 383, 386; *Patterson v. Railroad,* 76 Penn. St. 389; *Huddlestone v. Machine Shops,* 106 Mass. 282; *Ford v. Railroad,* 110 Mass. 240; *Gottlieb v. Railroad,* 100 N. Y. 466. (4) Deceased was not injured by the fault or neglect of a fellow-servant. (5) Deceased had a right to assume that defendant would furnish him with reasonably safe machinery and appliances with which to carry on its business, and that cars to be

handled and coupled by him on a dark night would be provided with reasonably safe couplers or draw bars. *Gibson v. Railroad*, 46 Mo. 169; *Lewis v. Railroad*, 59 Mo. 495; *Dale v. Railroad*, 63 Mo. 459; *Long v. Railroad*, 65 Mo. 229; *Parsons v. Railroad*, 94 Mo. 292. (6) If it appears from the evidence that deceased, although negligent, would have suffered no injury had proper care and caution been observed by defendant, plaintiff is entitled to recover. The evidence in this case shows that Thomas would not have been killed if defendant had not furnished him with a coupler not fit for use in connection with ordinary freight car couplers. *Brown v. Railroad*, 50 Mo. 465; *Bergman v. Railroad*, 88 Mo. 678; *Dunkman v. Railroad*, 95 Mo. 244.

SHERWOOD, C. J.—Action for damages brought by plaintiff as widow for injuries received by her deceased husband while in the service of the defendant company, resulting in his death.

The deceased had been in the employ of the company as night switchman in that particular locality since the preceding August, but prior to that time, and during the winters of 1884–5 and up to April of the latter year, he was employed as a switchman in the same yards.

The accident in question occurred about three o'clock in the morning of February 17, 1886, in the yards of the defendant at Nevada. Defendant, at the date aforesaid, had a number of sidetracks and switches at said place, and what is commonly known as a pass-track, for storing cars that were to be distributed for various points. The switch, which enabled cars to be removed from the main line onto said pass-track, was north of defendant's depot. The yard, from the north part of said switch, gradually sloped towards the south end of the yard; so that when cars were switched in

from the main track on the north onto the pass-track they would run down of their own momentum to the south part of said yard, unless stopped with the brakes thereon.   The Lexington & Southern road runs from Pleasant Hill, Missouri, while the Missouri, Kansas & Texas runs from Hannibal, Missouri, through Nevada, to Denison, Texas.   Nevada was a distributing point for all cars coming over either of said lines, which were to be transferred from one to the other.   The station agent of said city of Nevada had superintending control over said yards, and there was also employed by him at said date a night yardmaster and two night switchmen, who were required, among other things, to couple and switch cars and make up trains in said yard after said cars were distributed as aforesaid. Defendant also had at that time a car inspector at Nevada, whose duty it was to inspect all cars, coupling apparatus, etc.   Cars coming from other roads were switched off and transferred by defendant at said point, and it was a part of deceased's duty to assist in coupling and uncoupling the same, the petition expressly alleging that it was the duty of the deceased, as night switchman, to manage switches and couple cars and engines together.

Among the cars which came into defendant's yard at Nevada for distribution, at and prior to said date, were what are commonly called fruit cars, containing the Miller patent coupler.   These cars usually have platforms about three feet wide, running clear across each end of the car, and if the drawheads pass each other when a car of this kind is coupled to an ordinary freight car there is nothing to prevent the platform from coming in contact with the end of the freight car, in consequence of which a person between said cars, under the circumstances, would necessarily be injured.   The Miller coupler is used, so that the cars containing same

may be attached to either freight or passenger coaches. *It is in use on all passenger coaches*, and is so arranged that when two cars, both of which contain the Miller patent coupler, come together, they will couple themselves. It is necessary to use a link and pin to couple an ordinary freight car and the Miller coupler together. On the Miller coupler there is a groove into which the drawhead of the other car containing a similar coupler fits, when the cars come together. These couplers are fitted with a spring which presses them to the left, and when they come in contact they slip past each other until they come to a catch. In this way they act automatically, and couple themselves. The ordinary freight cars have a drawhead with a large pocket on the top, flaring wide, so that when the cars come together they cannot well miss each other. The Miller coupler has a small pocket, and it slopes to the outside and lets the link run around it.

The undisputed evidence shows that the coupling of an ordinary freight car to the Miller coupling is attended with greater danger than an ordinary coupling of freight cars, and that a switchman who once uses the Miller coupler will readily recognize that there is great danger in making such couplings, unless made with care and caution.

All the witnesses who testify upon the question agree that the only safe way to make a coupling like that attempted when deceased was killed is to put the link in the Miller drawhead, fasten it with the pin, properly adjust the link, and then couple to the freight car.

It was in evidence that the fruit car in question came in to Nevada about half an hour before the accident happened, and was loaded with oranges from the state of California, and at each end and at the sides of this car were the customary wire screens for its ventila-

tion, which were obvious to ordinary observation, and the fragrance from the oranges was readily discernible at a considerable distance from the car.   It is in evidence, also, that the orange season in 1885 began in the month of December, and from January 15, to the seventeenth of February, some twenty-five of these Miller coupling fruit cars had come through defendant's yards at Nevada, deceased on several occasions having coupled ordinary freight cars to the Miller coupler fruit cars, and no injury had hapened to anyone in consequence of coupling such cars.   The particular car belonged to the Central Pacific Railway Company and was part of a freight train, and came in to Nevada about half past two o'clock on the morning of the seventeenth of February, and was coupled to an ordinary freight car.   The car inspector of defendant inspected both the Wabash car and the fruit car almost as soon as they came in to Nevada, and before any coupling was attempted and found that the coupling apparatus and other machinery of both cars were sound and in good condition.   As the oranges were perishable property, necessitating their being sent forward at once to their destination, Kansas City, the fruit car was first taken to the pass-track.

Switchman Shea got on this car, and after it had run down about one hundred and fifty yards from the north end of the switch he set the brakes and stopped it. Hollister, the yardmaster, had in the meantime sent in on said pass-track a Wabash freight car, similar to those in use by defendant on said pass-track, and was proceeding to look after same and couple it to the fruit car, but before he got to the Wabash car deceased came out of the switchman's shanty with his lantern lit, passed by the fruit car, and of his own accord, without any direction from the yard master, or anyone else, climbed on top of said Wabash car and commenced

setting the brakes thereon, so that he could get it under control before it came down to where he desired to couple it to the fruit car. When Hollister saw that deceased was looking after the Wabash car he went back to look after some other cars. He had no conversation with deceased, and never saw him again until he was killed.

Before the couplings were made Brownell, the conductor, who, as he testifies, was making up the freight train for Kansas City, and was there, taking the numbers of the cars which were to form that train, while doing so, took the numbers of the Wabash car and of the Central Pacific or fruit car; and while the Wabash car was some ninety feet from the fruit car, and proceeding slowly towards the same, saw the deceased running ahead towards the fruit car in order to make the coupling. The *link* was then in the drawhead of the *Wabash car*, and Brownell, knowing the danger with the link where it was, told the deceased to change the link to the fruit car.

Brownell is confident that deceased heard him, and that deceased knew that he was coupling the freight car to the fruit car. The link was not changed, and deceased attempted to make the coupling with the link in the drawhead of the Wabash car, instead of changing it to the fruit car. The drawheads passed each other; the cars came together and caught deceased, from the effects of which he died in a short time. Deceased had his lantern, and, as the platform upon the end of the fruit car was projecting three feet, and extending clear across same, could not help seeing that it was a Miller coupling, as freight cars do not generally have such platforms. He had also passed by the fruit car a few minutes before; and the fragrance of the oranges, and the fact that the car was upon the track where he was required to couple same, must

necessarily have warned him that he was dealing with the Miller coupler. He must, also, have known all about it; for the undisputed evidence shows that he came out of the shanty, went to the Wabash car, took it on down for the purpose of coupling same to the fruit car, without consulting anyone with reference to the matter. Deceased had ample time to have changed the link from the Wabash car to the fruit car after he was warned by Brownell.

According to the undisputed testimony of both Hollister and Brownell, it was the duty of deceased to take no chances when making couplings, and so he was instructed. He should have come out from between the cars after attempting to make the coupling. All the evidence in the case tends to show that deceased was guilty of negligence in undertaking to make the coupling with the link in the drawhead of Wabash car, instead of putting it in the drawhead of fruit car. And the fruit car was coupled to the freight car within two hours after the accident, and taken northward.

From all the evidence in the cause, it seems clear that if the deceased had placed the link in the drawhead of the fruit car, and then made the coupling in the customary way, that the probabilities are in favor of the non-occurrence of any injury to him. And it was in evidence that the deceased had been careless of his personal safety on prior occasions, and on one of them had received an injury, having gone out to couple cars in the night time without his lantern.

The instructions given and refused will accompany this opinion.

Under the instructions given, the jury returned a verdict for the plaintiff in the sum of $3,000; and, after the usual motions ineffectually filed, the defendant appealed to this court.

I.  It is unnecessary to consider the sufficiency of the petition in this cause, or whether, if insufficient, its deficiencies were cured on the principle of "express aider," by reason of the issues raised by the answer, since the heart of this cause lies in two points of view:

*First.*  As to whether the injury received by the deceased was incident to the service in which he was engaged; and, *second,* whether negligence can be imputed to a railway company when simply obeying constitutional and statutory mandates in the reception and transportation of the cars of other railway companies, when such cars are in sound condition, though differing in their coupling apparatus from those of the receiving company.

As to the first point:

The petition herein expressly alleges that "it was the duty of the said W. I. Thomas, the deceased, as such night switchman, to manage the switches, couple cars and engines together," etc.  It is not pretended, nor could it be with any semblance or show of reason (especially in the face of the allegations of the petition just noted), that it was the duty of the decedent only to couple *a certain description of cars together,* leaving those of another sort to be coupled by some other employe.

The service in which he engaged required him as night switchman to couple *all cars* that were brought into the defendant company's yards at Nevada for that purpose.  This remark, of course, leaves out of view cars which were in bad condition in consequence of defects arising from being out of repair, and not those in good condition, however differing as to their methods of coupling from those owned or operated by the defendant company.  It was his duty to switch cars and couple cars; *all* cars that were in sound condition

and good order, no matter what their peculiar couplings were, nor from what quarter they came. This was the measure of his duty and his service, and this was the measure of his risk as an incident of that service. That a servant assumes such risks as are thus incident to the service in which he engages is so well supported by authorities that it seems to be a work of supererogation to cite or quote from them. And the rule as to the assumption of such risks is not varied or in any manner affected by the hazardous nature of the employment; whatever hazards are concomitants of the employment, such hazards the employe assumes necessarily when engaging in the performance of the duties pertaining thereto.

*Hulett's case*, 67 Mo. 239, directly illustrates the case at bar. There an experienced brakeman undertook to couple two cars in nowise defective, but of unequal heights, without using the ordinary crooked pin adopted for preventing accidents in such cases. He knew of the inequality in height of the cars, their difference being obvious to the eye of anyone, but he *miscalculated*, and in consequence was injured, and it was held that he had no cause of action. In that case, *Gildersleeve case*, 33 Mich. 133, was approvingly cited and followed, where COOLEY, C. J. said: "The car which was the cause of the injury in this case was not in itself dangerous, or unfit for use. In coupling it with other cars peculiar caution was requisite, making it more liable to cause injury than would be a car of more modern construction. Its use, therefore, made the employment more dangerous than it otherwise would be. In that particular, the case may be compared to that of a farmer, who, with knowledge on the part of himself and those in his employ, that a horse he has had in use is disposed to be fractious and unmanageable, continues nevertheless to use him in his business.

It may be compared to that of the merchant who continues to make use of a fluid for light, when something else which is within his reach has been demonstrated by experience to be safer. So far as we can perceive, the case of the manufacturer would not be different in principle, who should continue the use of a building which, in the event of a conflagration, would subject his employes to greater risks than would one of different construction. Comparisons innumerable might be made with this case in all the avocations of life.

"Now any rule on this subject must be a general rule, and not one to be applied to railroad companies alone. * * * The case is consequently divested of any question except such as would concern the relation of master and servant, and the same rule would govern the case that would govern were the question to arise between the farmer, the mechanic or the manufacturer and the persons in his employ. And, treating it as a question of such broad application, we do not perceive any ground upon which plaintiff's case can safely be planted, which comes short of this: That the employer is under obligation to his servants under all circumstances to make use of the safest known appliances and instruments, and is responsible for any failure to discard what is not such, and to supply its place with something safer. Any doctrine so far reaching as this would manifestly be destructive of the general rule, and would almost make the employer the guarantor of his servant's safety in his employ." And the judgment in that case was reversed.

Wharton says: "Hence, to turn specifically to the consideration of the employer's liability, an employe who undertakes the performance of hazardous duties assumes such risks as are incident to their discharge from causes open and and obvious, the dangerous character of which causes he has had opportunity to

ascertain.   The same rule applies as to perils, not inci-
dental to the particular work of which he has notice
either express or implied." Law of Negligence
[2 Ed.] sec. 214.

In *Price v. Railroad*, 77 Mo. 508, it was ruled that
"where a servant accepts employment knowing as well
as his employer its peril, or continues in service after
he acquires such knowledge, he has no claim for
damages against the employer for an injury occasioned
by such perils." An approved author says touching
the subject under discussion: "As we have seen it to
be the duty of the master to point out such dangers as
are not patent, so it is the duty of the employe to go
about his work with his eyes open.   He may not wait
to be told, but must act affirmatively.   He must take
ordinary care to learn the dangers which are likely to
beset him in the service.   If the master provides written
or printed instructions or warning, it is his duty to
read them.   He must not go blindly and heedlessly to
his work, when there is danger.   He must inform him-
self.   This is the law everywhere.   The servant is held,
by his contract of hiring, to assume the risk of injury
from the ordinary dangers of the employment; that is
to say, from such dangers as are known to him, or dis-
coverable by the exercise of ordinary care on his part.
He has, therefore, no right of action, in general,
against his master for an injury befalling him from
such a cause.   His right to recover will often depend
upon his knowledge or ignorance of the danger.   If he
knew of it, or was under a legal obligation to know of
it, it was part of his contract, and he cannot, in
general, recover." Beach on Contributory Negligence
[2 Ed.] secs. 369, 370.

Another author says:   "If the servant, before he
enters the service, knows, or if he afterwards discovers,
or if, by the exercise of ordinary observation or reason-

able skill and diligence in his department of service, he may discover, that the building, premises, machine, appliance or fellow-servant in connection with which or with whom he is to labor is unsafe or unfit in any particular, and if, notwithstanding such knowledge, or means of knowledge, he voluntarily enters into or continues in the employment without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him.'' 2 Thompson on Negligence, 1008.

Another work of recognized merit says: "Notwithstanding the general rule that the master is bound to furnish safe and sound materials, machinery, etc., yet if the work upon which a servant is employed consists, in whole or in part, in handling unsafe or unsound things, known to him to be so, and which, by the very nature of the business, must be handled while in that condition, the servant assumes the risk of doing so. Thus, a railway servant, employed to remove damaged cars to a repair shop, has no right to complain of injuries suffered from the known defects of such cars. And, where a business is obviously dangerous, and is conducted in a manner which is fully known to the servant at the outset, he assumes the risk of its conduct in that manner, although a safer method could have been adopted. The ordinary risks of a particular business are those which are part of the natural and ordinary method of conducting that business, although they may fairly be called extraordinary with reference to a different business.'' 1 Shearman & Redfield on Negligence [4 Ed.] sec. 185.

In a recent case in Massachusetts it is held that if a business is essentially attended with extraordinary dangers, that these are among the risks assumed. *Joyce v. Worcester*, 140 Mass. 245.

And it has been expressly held in several well-considered cases that one of the risks a railway employe assumes on entering the employment is the risk which attends the reception and transportation of cars from foreign companies, though they be not constructed with the most approved appliances, and that it is not negligence on the part of a railway company to receive and transport such cars in the ordinary course of its business. *Baldwin v. Railroad*, 50 Iowa, 680; *Railroad v. Flanigan*, 77 Ill. 365; *Railroad v. Black*, 88 Ill. 112; *Railroad v. Smithson*, 45 Mich. 212; *Hathaway v. Railroad*, 51 Mich. 253. See also *Tuttle v. Railroad*, 122 U. S. 189; *Kelley, Adm'r, v. Railroad*, 21 Am. & Eng. R. R. Cases, 633; *Darracutts v. Railroad*, 31 Am. & Eng. R. R. Cases, 157. In the case last cited it is said: "There are also certain correlative duties on the part of the employe to the company. Of these, one is the duty of the employe to be reasonably observant of the machinery he operates, and to report any defects he may discover therein to the company. Another is to use ordinary care to avoid injuries to himself; for the company is under no greater obligation to care for his safety than he himself is. He must always obey the rules of the company prescribed for his safety, and which are brought to his knowledge. And he must inform himself, as far as he reasonably can, respecting the dangers as well as the duties incident to the service upon which he enters."

In *Railroad v. Black, supra,* the complaint was that the coupling-bar of a flat car, loaded with iron, of one company, and of a caboose of another company, were of different heights, and the plaintiff, in stooping down between the cars to do the coupling, had his hand crushed between the bars. It is said in the opinion by Mr. Justice SHELDON, that it was the plaintiff's own fault "in not ascertaining the condition of the cross-bars

before attempting the coupling;" and that, "from his experience as a switchman in the yard, and the frequent coming in of cars thus constructed from other roads, he had reason to suppose that the car in question was liable to have a drawbar in the situation it was here, and it was his plain duty to examine and ascertain, as he safely might have done, what was the condition of the car in this respect before venturing upon the coupling."

It seems there is some conflict in the testimony as to whether Brownell notified the deceased on the night of the accident to change the link, but it is wholly immaterial whether he did so or not on that occasion, because the testimony is undisputed that the deceased had coupled similar cars on several occasions, and must have known from that circumstance and from the *very business of the railway service,* that such cars were likely to come in over to the defendant company's road for reception and transportation at any hour of the day or night; and, besides, the fragrance issuing from the car laden with oranges, and the shape of the platform of the fruit car, constituted notice in and of themselves that a car differing from an ordinary freight car in its appliances was to be coupled to the Wabash car.

On the point in hand Judge COOLEY in *Smithson's case, supra,* very pertinently observes: "The difference is very marked and striking, and it is quite impossible to couple the double deadwoods or to approach them for the purpose, with any degree of attention, without observing it. This is so whether the coupling is done in the daytime or night-time; for in the night every switchman has his lantern with him, or should have it on all occasions. If, therefore, a switchman were to declare that he had attempted to couple the double deadwoods without noticing how they differed from the cars of defendant, the conclusion would be inevit-

able that he had gone heedlessly in the performance of a duty requiring great care, and that he had not allowed his eyes to inform him what was before him.    Moreover, the business of the road was of itself a notification that many differences requiring attention in coupling were to be encountered by the switchmen and brakemen.    The Michigan Central is a great common way for the cars of all the railroad companies of the country, and every man in the employ of the defendant, if he has ordinary intelligence, is perfectly cognizant of the fact.    He knows, too, that the cars of the several railroad and transportation companies differ, and that at one time or another all these differences may appear in the cars he may be called upon to couple or uncouple. Every train is likely to have several kinds, and he cannot assume as he passes from one to another that the two will be alike; much less that the whole train will be.    To notify him specially of the differences would not only be troublesome and expensive, and oftentimes, as above explained, confusing, but it would be a work of supererogation; for any man capable intelligently of performing the duty would be no wiser after the notice than before; and a man who would not heed the information the very nature and course of the business would impart to him would be protected by no notice.    The best notice is that which a man must of necessity see and which cannot confuse or mislead him; he needs no printed placard to announce a precipice when he stands before it."

And in the recent case of *Jackson v. Railroad*, 104 Mo. 448, it is said:    "Where a railroad company is in the habit of receiving and transporting cars loaded with timbers and iron rails which project over the cars upon which they are loaded, the risks arising from such projecting timbers or rails is nothing more than an ordinary risk assumed by the brakeman."

No difference in point of principle can be shown to exist between the case there mentioned and the present instance; the same considerations which dominate one must dominate the other. Tested by the authorities already cited, the injuries received by the deceased must be regarded as incident to the risks assumed by him on entering the employ of the company, and that, besides, his own contributory negligence in attempting to make the coupling in the way he attempted to make it constitutes a bar to any recovery. But further on this point: If it be true that the Miller coupler is used on *all passenger* cars, and plaintiff should be allowed to recover as to a fruit car, then it must needs follow that a like recovery could be had whenever a like injury should occur in the attempt to couple a freight car to an ordinary passenger car, both belonging to the defendant company.

*Second.* Now as to the second point proposed for discussion: The constitution of this state declares: "Every railroad company shall have the right, with its road, to intersect, connect with or cross any other railroad, and shall receive and transport each other's passengers, tonnage and cars, loaded or empty, without delay or discrimination." And section 2626, Revised Statutes, 1889, is but a legislative declaration of the same mandate. It will be observed that this language is *mandatory.* Under its terms, it becomes the *imperative duty of* every railway company in the state to *"receive and transport each other's passengers, tonnage and cars, loaded or empty, without delay or discrimination."* Of course this language, under the operation of a familiar principle, is to receive a reasonable construction, and such construction would obviously exclude damaged cars, and cars out of repair; but not those whose construction or coupling apparatus differs from those belonging to, or operated by, the defendant company.

Now, negligence is the result of a failure to perform a duty; from this premise it follows that no course of conduct can justly be termed negligence which results from a simple performance *of a duty enjoined by law*, to-wit, the reception and transportation of cars from other roads. And so this point has been ruled in states having statutory provisions resembling our own. Thus in Michigan COOLEY, J., says: "The primary fact that must rule this controversy is that the Michigan Central Railroad Company is compelled to receive and transport over its road all the varieties of freight cars which are offered to it for the purpose, and which are upon wheels adapted to its gauge. It is compelled to do so: *First*, because the necessities of commerce demand it. It cannot and would not be tolerated that cars loaded at New York for San Francisco, or at Boston for Chicago, should have their freight transferred from one car to another whenever they passed upon another road. Time would be lost, expense increased, injuries to freight made more numerous, and no corresponding advantage accrue to anyone. It is compelled to do so, *second*, by its own interest. To attempt to stop every car offered to it at its own *termini*, that the freight might be transferred to its own vehicles, would be to drive away from its line a large portion of its traffic, and compel it to rely upon a local business for which it must increase its charges to make up if possible for what it would lose. But, *third*, the statute itself, requires it. It is provided by General Laws, 1873, page 99, that 'every corporation owning a road in use shall, at reasonable times and for a reasonable compensation, draw over the same the merchandise and cars of any other corporation.' The necessities of commerce require this with such imperative force that there could scarcely be a more flagrant breach of corporate duty than would be a refusal to obey this law; and the inter-

ference of the state to punish could hardly fail to be speedy and effectual.

"It does not follow that laborers must sacrifice life or limb in order to meet this great public necessity. It is certain that there must be brakemen and switch-men, and that these must be called upon to perform the somewhat hazardous act of coupling cars, and of making up trains of cars of different constructions. But the act is dangerous: *First,* because inevitable accidents will sometimes occur; and, *second,* because even in the most exposed positions men will sometimes be wanting in ordinary prudence. But when accident or negligence intervenes any business is dangerous; the difference in danger is only one of degree. There are more risks in operating a mill by steam than by water, but this does not prove the use of the steam engine to be negligence in the mill-owner. The same remark may be made of different cars; one construction of car may render necessary a higher degree of care in coupling than another calls for; but there is no ground whatever for imputing to this defendant, or to any other railroad company, legal negligence for that which was a necessity of its business, and which all persons in its employ must be presumed to have known was a necessity." *Railroad v. Smithson, supra.*

In another case in that state involving similar facts as to foreign cars, SHERWOOD, J., said: "The risk in making that coupling was incident to the service the plaintiff had voluntarily engaged in,—one of which, from the very nature of the business, he must, under the circumstances, have been cognizant; and no other or better notice of which could be possibly given than that which the plaintiff had as he stood there and saw the two cars with the deadwoods approaching each other; and no amount of experience could further or better warn the plaintiff of the dangers then before

him in making the unfortunate coupling; the chances were his." *Hathaway v. Railroad, supra.*

In Iowa, under a similar statutory provision, a like ruling has been made, SEEVERS, J., remarking: "It must be borne in mind that the question is whether it is negligence for the defendant to receive and transport cars of other roads in general use and the ordinary course of business, which are not constructed with the most approved appliances. Public policy has some bearing on this proposition. It is undoubtedly of great importance to the trade and commerce of the country that a car once loaded should go through to its destination without breaking bulk. It is unnecessary, it is believed, to enlarge on this point, as its importance will be readily acknowledged. Suppose, then, the Union Pacific Railroad Company should deliver a car, constructed as these were, to the defendant, which was loaded with merchandise destined for New York, and as provided in the Code, section 1292, and in strict accord therewith, request the defendant to transport the same, would the defendant be bound to receive such car, and for a refusal would it be liable in damages, the only ground of refusal being that it was dangerous to its employes to transport such a car; while on the other hand it would be shown that cars so constructed were in use on all other roads? It is sufficient to say that it admits of great doubt whether such a defense should be permitted to prevail. The occasional or frequent use of such cars on any road, in the ordinary course of business, is one of the ordinary risks an employe assumes. He knows or is bound to know that cars from other roads are being constantly hauled over the road whose employe he is. The most ordinary observation will teach him this. He must know these cars may be differently constructed." *Baldwin v. Railroad, supra.*

Similar rulings have been made in Illinois without any controlling statute. *Railroad v. Flanigan, supra; Railroad v. Black, supra.*

The element of negligence, as a mere consequence of receiving and transporting the Central Pacific or fruit car in the case at bar, is, therefore, eliminated from this case, and with that gone there is nothing left in the other circumstances detailed to cast any liability upon the defendant company.

The conclusion reached is, therefore, that the judgment should be reversed. All concur, except BARCLAY, J., who dissents.

### SEPARATE CONCURRING OPINION.

SHERWOOD, C. J.—I here call attention to the fact that the obligatory force of section 13, article 12, of our state constitution has at last been recognized by this court as a *mandatory factor* in cases of this sort; though, pending the determination in this case, I have been gravely told *"the constitution has nothing at all to do with it."*

This remark finds full support, however, in *O'Hare v. Railroad,* 95 Mo. 662, where, in coupling with another car a foreign car, sound in every respect, an employe received injury, and was allowed to recover judgment, although he himself testified that when he went to make the coupling he did so *"without looking to see what kind of car it was."* *Railroad v. Smithson,* 45 Mich. 212.

This court, in *O'Hare's case,* gave no heed whatever to the constitutional mandate aforesaid, nor to its being necessarily relevant to the issue of negligence. The constitutional provision already quoted was not even in that case so much as *noticed;* but the case was tried in the lower court, and affirmed in this court

on the theory that the foreign car was a *"man-killer,"* and, therefore, that the connecting road was under *no obligation* to receive it.

I refer for a more full expression of my views to my dissenting opinion in that case. Those views find abundant support in the majority opinion herein. I am glad that at length "returning Justice lifts aloft her scale."

BARCLAY, J. (*dissenting*).—The main fact of plaintiff's case is that while deceased was proceeding by night, in the line of his duty, to couple a moving Wabash freight car to a standing fruit car, and had part of his body between them for that purpose, the drawheads passed each other and allowed the cars to come together, fatally crushing him.

On this, a charge of negligence in the circumstances is based, plaintiff claiming that deceased was ignorant of the extraordinary danger that caused his death.

The petition need not be quoted.

The answer, among other things, alleged a failure of deceased to observe a written contract to use a "coupling knife," furnished him "when he went to work" as switchman. This contract as recited is dated November 9, 1885. Defendant's own evidence, however, showed that the use of that appliance could not have averted the injury; so that defense is now unimportant, though its facts have a bearing on another point mentioned later.

I.   A preliminary question grows out of the ownership of the "Central Pacific fruit car." It was received from some far western carrier, for transportation by defendant over its line in Missouri. It was inspected at Nevada by Mr. Krauth (one of the

witnesses for plaintiff) and found in good order, before the accident. It was being used to form part of a train of the defendant, and the duty of the latter regarding it (in the particular now under consideration) was no different from what it would have been had the car been its own property.

The constitution of Missouri (expressing in a most emphatic way the obligation resting on railroads as common carriers) requires all railway companies to "receive and transport each other's passengers, tonnage and cars, loaded or empty, without delay or discrimination." Constitution, 1875, art. 12, sec. 13; R. S. 1889, sec. 2626. But that provision of our law affords no sanction for the introduction of any car into defendant's trains, that is not reasonably safe for use by those required to work about it and who have no notice of such condition.

A defective car acquires no improved legal standing, because it is received from a connecting line, pursuant to the constitution. This is the evident effect of the judgment in *O'Hare's case* (1888), 95 Mo. 662, wherein a majority of this court held the Chicago & Alton Railroad Company liable to an employe for an injury inflicted by a "United States rolling stock car" of the Hannibal & St. Joe Railroad Company in transit.

Moreover, the danger to which Thomas succumbed lay, not in using the car with the Miller coupler (for the latter is safe enough when brought in contact with others of its own kind), but in using that coupler in juxtaposition to a common freight-car drawhead. This manner of its use was directed by defendant's yard-master, and for his action in that regard defendant is responsible.

The dangerous operation of the "foreign car" coupler (as used in this instance) was not unknown to defendant, for its yardmaster admits he was fully aware

of it, long before this accident. So there is no need to consider any question of defendant's opportunity to inspect the car.

Freight trains, under existing laws, are necessarily composed of a mixed company of cars of various owners. When defendant, having made up such a train, mans it with its own operatives and requires them to perform, upon or about it, the work for which they are hired, it becomes responsible to them for the exercise of the master's duties in respect of such cars (as of other necessary instrumentalities of the employment). *Gutridge v. Railroad* (1887), 94 Mo. 468; *Gottlieb v. Railroad* (1885), 100 N. Y. 462.

For the purposes of the case in hand the Central Pacific fruit car will be treated merely as part of the defendant's train.

II. Assuming for the moment that deceased had no knowledge or notice of the peculiarities of the Miller coupler (a question considered in a later paragraph) what was the measure of defendant's duty toward him?

Defendant contends that as the fruit car was in good repair (as reported by the inspector who saw it shortly before the accident) no liability can arise from the action of its coupling machinery; such danger being one of the ordinary risks of the service.

The risks which a servant assumes in entering an employment are such as remain after the master's exercise of ordinary care to make it reasonably safe. *Abel v. President, etc.* (1891), 128 N. Y. 662; *McGovern v. Railroad* (1890), 123 N. Y. 280; *Dorsey v. Construction Co.* (1877), 42 Wis. 597; *Railroad v. Triplett* (1891), 15 S. W. Rep. 831, and 16 S. W. Rep. 266.

The master does not insure the servant's safety, nor is he bound to furnish the most improved or the

best machinery for the work in hand; but his duty is to use ordinary care that such as he does supply is reasonably safe and suitable for the purpose to which it is put. A danger, unknown to the servant, arising from a breach of this duty of the master, is actionable, if damage results; and such danger is not one of the ordinary risks of the employment. *King v. Railroad* (1882), 14 Fed. Rep. 277.

This court, in *Gibson v. Railroad* (1870), 46 Mo. 170, unanimously declared that principle, in an action where it appeared that a brakeman had tried to effect a coupling, "and, while engaged in inserting the link in the drawhead, the cars came so closely together that, in withdrawing his hand, it was caught between the deadwoods, or buffers, and smashed so that he lost three fingers." The court said (page 173) that "the testimony in the case tends strongly to show that the condition of the drawhead was not due to use or negligent repairing, but to improper and defective construction." The judgment therein, based on a finding of such neglect to furnish proper appliances, was affirmed.

The fact that a given appliance or machine is in fair working order is not necessarily conclusive of its reasonable safety for the use for which it is supplied. This legal truth is exemplified by many judgments besides the *Gibson case* just cited.

In *Huhn v. Railroad* (1887), 92 Mo. 440, the yard-master at Independence, Missouri, was killed in consequence of catching his foot in an open guardrail, while at work in the railway yard. There was no defect in the rail or in the track, but the guardrail was unblocked. This court unanimously held that that fact raised a question for the jury, viz., whether or not the track in that state was reasonably safe for defendant's employes.

A similar ruling was made in *Hamilton v. Rich Hill, etc., Co.* (1892), 108 Mo. 364, by a majority of

division number 1, at the present term. The injury there was occasioned by an open, unblocked space between the fixed rails of a switch, which defect (to quote from Judge BLACK's opinion) "was one in the original construction of the road."

In *Ellis v. Railroad* (1884), 95 N. Y. 546, the absence of buffers, properly placed, to keep the cars asunder, was held evidence of want of reasonable care on the master's part.

In *Gowles v. Railroad* (1881), 84 N. C. 309, a verdict was sustained for injuries to a brakeman resulting "from the fact that the cars were so constructed that their 'bumpers' did not correspond or fit to one another as they should have done to prevent the cars coming in too close contact."

In *Wells v. Railroad* (1891), 27 Pac. Rep. 688, a brakeman had lost his life in attempting to couple two freight cars, whose coupling attachments are described as "defective" because "the drawhead of one car passed over the drawhead of the other, allowing the cars to come together, whereby he was fatally injured;" one was out of repair so "that another could not be coupled to it in the ordinary way with safety;" all of which was held to sufficiently support a finding of negligence on the part of the defendant.

In *Railroad v. Rowan* (1885), 104 Ind. 88, a brakeman, in the discharge of his duty, on top of a box car, was hit by a low bridge on the railway line. The bridge was in perfect order, the train likewise; but, when together, the court held that they tended to show a want of care in supplying proper appliances for the service.

The mere action of machinery often gives evidence of its safe or dangerous nature, without more. *Mooney v. Lumber Co.* (1891), 28 N. E. Rep. (Mass.) 352. If the fatal performance of the Miller coupler on the fruit

car in this case, when brought into contact with the drawhead of the Wabash car, was its normal and ordinary action when in sound condition, then, in my opinion, the facts of its operation at that time and the consequences thereof have a clear tendency to prove that such coupling machinery, so used, was not reasonably safe for an employe, required by his duty to place himself between such cars, unaware, and not notified of such danger. The American precedents above cited support that position.

There is positive evidence that deceased could not make the coupling without placing part, at least, of his body between these cars. When his service required that of him it made little difference, in fact, to him, and, in my judgment, it makes no difference in contemplation of law, whether the action of the cars, in fatally closing upon him, is ascribable to a defective condition of the appliances or to faults in their original construction. The true question is, whether or not the machinery furnished is reasonably safe, and whether ordinary care has been used to have it so. *Railroad v. McDade* (1889), 135 U. S. 554; *Meyers v. Iron Co.* (1889), 150 Mass. 125.

The testimony for both parties discloses (and defendant's counsel in his summary of the case admits) that "the undisputed evidence shows that the coupling of an ordinary freight car to the Miller coupling is attended with greater danger than an ordinary coupling of freight cars." And there is much testimony to the point that the former coupling is "very dangerous," and requires a much higher degree of care to accomplish safely than an ordinary coupling.

The coupling machinery of freight cars in general use prevents the woodwork of them from coming together (as plaintiff's witnesses, Krauth and Maxey testified), and preserves sufficient space (about two

feet) between the cars to protect an employe engaged in manipulating that machinery.

The Miller drawhead is shaped somewhat differently, but is located in the same position. Its danger, when used in conjunction with a common freight car, lies in its liability to pass off to one side because of its hidden mechanism, instead of furnishing the protecting resistance (it would seem to offer) to the other drawhead. When it passes to one side (as in this case) there is nothing to prevent the cars coming so close together as to endanger the life of anyone between them. This peculiarity creates a far greater danger (as all the witnesses on the subject concede) than arises in coupling freight cars of the usual pattern. That danger is, from its very nature, not open to ready observation by one who attempts to use such machinery for the first time; but in *Hulett's case* (1878), 67 Mo. 239, the risk was obvious, and the record shows that that accident occurred by daylight about noon.

If the master was advised of the unusual risk in the case at bar, and failed to notify the employe who was ignorant thereof, then the former would be liable for consequences befalling the latter because of want of knowledge of the unexpected danger. This principle is firmly settled in the law.

In *O'Neil v. Railroad* (1881), 3 McCrary, 423, and 9 Fed. Rep. 337, plaintiff was a brakeman, injured while attempting to couple a car to an engine, and whose claim was "that the deadwoods on said car and engine were insufficient," etc., "by reason of their not keeping said car and engine apart and allowing the drawheads of the engine and car to interlap, thereby catching and crushing plaintiff's arm," etc., and "that plaintiff was ignorant of the dangerous condition of the appliances for coupling said engine and car together," etc. The car was a "foreign" one, that is, from another railroad.

In sustaining a verdict for plaintiff, the court said, that "if the employer introduces, without notice to the employe, some new and unusual machinery involving an unexpected or unanticipated danger, through the introduction of which the employe, while using the care and diligence incident to his employment, meets with an accident like that in question, it is not unreasonable to hold that the employer should answer therefor in damages."

In *Goodrich v. Railroad* (1889), 116 N. Y. 398, a brakeman's hand was crushed between the deadwoods of two cars, one of which was moving and the other at rest, "because the bumper of the moving car was defective and hung lower than it should have done, it passed under the bumper of the stationary car and permitted the deadwoods to come together." The court held that the plaintiff was thus "exposed to a danger not within the ordinary risks of his employment," and that the facts warranted the inference of neglect of duty on the part of defendant in the matter of furnishing suitable working appliances. On this point see also *Railroad v. Frawley* (1886), 110 Ind. 18; *Coates v. Railroad* (1891), 153 Mass. 297; *Thompson, Adm'r, v. Railroad* (1883), 14 Fed. Rep. 564; *Wheeler v. Mfg. Co.* (1883), 135 Mass. 294; *Smith v. Iron Co.* (1880), 42 N. J. L. 467.

The principle of these cases applies to that at bar, if the deceased (as the jury have found) was uninformed of the increased hazard arising from the introduction of the fruit car into the place it was to fill in defendant's train, since the evidence of defendant's yardmaster (on duty at the time) makes it evident that the master's representatives there were themselves fully advised of that danger.

III. The issue of Thomas' knowledge in the premises is the one of serious moment in the case.

Before going into it, there seems to be some occasion to remark upon the proper functions of the supreme court in reviewing actions like this.

In them we cannot rightly undertake, and it would be disregarding the constitutional rights of litigants if we assumed, to pass upon and determine controverted issues of fact. The constitution guarantees a trial of such issues by jury. Constitution, 1875, art. 2, sec. 28; R. S. 1889, sec. 2131, same as G. S. 1865, p. 673, sec. 12. It is our duty to give full effect to the guaranty.

As defendant, on this appeal, claims that the court should have taken the case from the jury for failure of proof, it becomes our duty to examine the whole evidence, and if (after giving plaintiff the benefit of the most favorable view of it, and of every reasonable inference therefrom) there appears substantial proof to support the verdict, we have no constitutional right to set it aside, merely because our conclusions on the facts may differ from those of the trial court and jury.

The instruction given for plaintiff, presenting her theory of the case, required the jury to find, among other facts, that the deceased "was not notified by said defendant of the unusual character of the fruit car to be handled and coupled, and was not otherwise advised of the character of said car and was not familiar with that description of car," etc. We will consider the case from the standpoint furnished by that instruction.

Defendant claims that the evidence conclusively shows that the deceased became acquainted with fruit cars of this sort by seeing them often, and having abundant opportunity to know their peculiarities. Its testimony certainly tends to establish these facts; but the jury found to the contrary, and our business now is to see if there is a substantial basis of evidence to justify that finding.

Waiving all question as to the burden of proof on the issue of Thomas' acquaintance with the danger, let us note what bearing, favorable to plaintiff, several facts have upon the issue of his knowledge, or the want of it.

a. It is not asserted that any superior ever expressly notified Thomas of any danger incident to such coupling as that in question. The claim is that he became possessed of knowledge thereof as a switchman in the yards.

b. These cars brought fruit from California during the orange season. The defendant attempted to show that Thomas had worked in the same place as switchman in the winter of 1884–5 and spring of 1885 until April, which would greatly have increased the probability of his acquaintance with such cars, as that period included the orange season of the year previous to that in which he was killed.

Defendant's station agent at Nevada, Mr. Penfield, alone, testified to that effect, on his direct examination, with such qualifications as these: "As my recollection serves me;" "I believe in the winter of 1884 and 1885 up to about April;" but, on cross-examination, he said he would not state it positively, but that such was his "impression." He further testified that "all the time he [Thomas] worked for me, he worked as switchman," and that "all switchmen are required to have them" (referring to a coupling "knife" mentioned in the contract by Thomas to use it, as set up in the answer); whereas that contract is dated November 9, 1885, and the answer alleges that it was entered into "*when he went to work.*"

In this condition of the pleadings and testimony the jury had ample ground, we think, for a finding that deceased was not in defendant's service during the orange season of 1884–5.

*c.* Plaintiff's showing is that deceased worked for defendant from the time he began (toward the close of 1885) till his death, February 17, 1886. As to his meeting such fruit cars during that period, witness Krauth said that he thought "that car was just about the beginning of the coming of those fruit cars that spring; as I said, they usually came through in the spring of the year and that one was, I think, about the first one that came through that year." On the same point another witness, Kelly, testified:

"*Q.* How long previous to this was it that you saw fruit cars of that character come through the yard down there—how long previous to the seventeenth of February, 1886? *A.* Well, I could not say that I noticed any, particularly, up to that time.

"*Q.* Then you can't say as to whether you had seen any or not? *A.* I could not say as to the time that I seen them, or whether I had or hadn't seen any that spring before that time. I disremember whether any had come through previous to that time, that spring or not; but I rather think they had not, for I think that was about the beginning of the fruit season that year; at any rate there had been very few that had come through that spring before that time."

It further appeared that Nevada was the junction of two railway lines of defendant viz., the Missouri, Kansas & Texas division and the Lexington & Southern division; that fruit cars, passing through, were sometimes in passenger trains. Deceased would have no occasion to work about any one of them unless it was transferred from one train to another there. He was on duty only at night and, presumably, slept the greater part of the day.

As to the number of such cars that went through Nevada, witness Krauth declared that "every spring

there is eight or ten cars come through here," while defendant's station agent said that between the first and seventeenth of February, 1886, five to ten such cars passed through, including day and night trains.

The yardmaster, Mr. Hollister, under whose direction deceased was working (and on whom the master's duties toward him chiefly devolved), testified for defendant that he had seen deceased make such couplings "say, two or three times;" but his testimony, touching the large number of such fruit cars, twenty-five or thirty that had passed through Nevada that season, was directly contradicted by plaintiff's witnesses. That was a most material fact in the case; and, if the jury did not credit his disputed evidence on that point, they would clearly have been at liberty to disregard his accompanying statement that Thomas had made "two or three" such couplings.

In view of all the testimony favorable to the plaintiff's contention on this branch of the case, it seems to me that it was manifestly a question of fact for the jury whether the deceased, from the course of his experience of a few months as switchman, on duty in the night only, had acquired notice or knowledge of the unusual danger, involved in making the coupling he was attempting when killed. *Dale v. Railroad* (1876), 63 Mo. 455.

IV. The issue of alleged contributory negligence of the deceased is the next point for attention. In considering it, the findings of the jury and trial judge already discussed, touching the unusual danger and Thomas' want of knowledge thereof, will be treated as established facts. So viewed the question of his negligence presents little difficulty.

*a.* The defense, resting on his omission to use the "safety coupler," mentioned in the answer is not urged

in this court. There is evidently nothing in it. Several witnesses testified that that contrivance would only protect the hands of the switchman and afforded no protection to his body.

*b.* It may be conceded (as claimed by defendant) that, in attempting such a coupling as Thomas was making, it would be safer to place the link in the Miller drawhead; but, if he was unaware of the peculiar action and danger of the latter, his failure to adopt that course cannot fairly be pronounced negligence in law.

The fruit car had been brought down into place on the passing track by Shea while deceased was in the "switchman's shanty." When Thomas came out and started toward the north end of the yard he met the Wabash car coming slowly along, southward. It had been started by the yardmaster, himself, leaving a link in the drawhead. He testified on this point: "I cut that car off myself, and I know that the link was in the Wabash car and in the south end of it."

"*Q.* Do you know that it was there when Thomas attempted to make the coupling? *A.* Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*

"*Q.* In riding cars down that way, is it customary to leave the link in the car that is moving? *A.* Yes, sir.

"*Q.* The invariable custom, is it? *A.* Yes, sir; it is a custom to invariably leave it there.

The plaintiff's (and, indeed, all the) testimony showed that as the Wabash car neared the standing fruit car Thomas, after properly adjusting the brake, descended and walked along with the former (the Wabash car) to make the coupling. His only light was a hand lantern. The night was dark; one witness said: "Terrible dark." His attention was necessarily

turned to the link in the moving car to direct its course so it should enter the drawhead of the standing car, according to the custom above described by the yard-master. The Miller drawhead had an opening to receive such a link. He was there to make the coupling, and, in attempting it in the usual way, no fault is chargeable to him in the absence of knowledge on his part of the danger peculiar to that machinery. There was nothing visible to notify him that, when the drawheads met, that of the fruit car would slide to one side, on account of its interior construction, and thus bring the cars together upon him.

Defendant's conductor of the train, that was being formed, Mr. Brownell, testified that, as the car approached, he warned Thomas to change the link into the other car, but that he only gave witness "the laugh," and paid no heed to the warning. But, on the plaintiff's side, the only other eye-witness of the accident deposed, in rebuttal, that no such warning or any warning at all was then given by the conductor.

If Thomas knew nothing of the Miller coupler, the fact that he may have passed near the fruit car on his way to take charge of the Wabash car, or even that he caught the "fragrance of the oranges" would scarcely furnish a just ground to declare that he was negligent as a matter of law, when the circuit court and jury have found that he was not, as a matter of fact, in view of all the evidence. The cargo of oranges was harmless enough if plaintiff was unaware of the special danger of the machinery in question.

The instruction for plaintiff required a finding that deceased was "in nowise guilty of any negligence or want of care," as essential to a verdict in his favor; and the instructions for defendant elaborated that proposition in language chosen by its counsel.

The finding on this issue in favor of plaintiff has substantial support in the testimony, and should not be disturbed.

The amount of recovery ($3,000) is not questioned, and no fault in the instructions has been pointed out. They embody correct principles of law, substantially as indicated herein. The evidence appears to me to sustain them, as already shown.

It is a matter of regret that it has been necessary to set forth the particulars of the case at such length; but, in view of the large amount of testimony, it has been unavoidable.

In my opinion the judgment should be affirmed.

SHERWOOD, C. J.—This cause having been reargued before the entire bench, the original opinion herein meets with the entire concurrence of every member of this court, except BARCLAY, J., who dissents.